Filed 9/13/23  P. v. Hughes CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JORDAN CHRISTOPHER HUGHES,<br><br>    Defendant and Appellant. | A166332<br><br>(Solano County Super. Ct. No. FCR-285903) |

This is Jordan Christopher Hughes's third appeal after he was convicted of attempted murder of a peace officer (Pen. Code, §§ 187 subd. (a), 664)[1] and three counts of assault with a firearm on a peace officer (§ 245, subd. (d)(1)).  In a prior appeal (*People v. Hughes* (2019) 39 Cal.App.5th 886, rev. granted Nov. 26, 2019 & dism. July 29, 2020, S258541 (*Hughes II*)),[2] this court held that mental health diversion statutes enacted in 2018 (§§ 1001.35, 1001.36) applied retroactively to nonfinal cases, conditionally reversed Hughes's judgment, and remanded the matter to the trial court with directions to conduct a mental health diversion eligibility hearing.  (*Hughes II, supra,* at pp. 896-897.)

---

[1] Undesignated statutory references are to the Penal Code.

[2] On Hughes's unopposed request, we took judicial notice of the *Hughes II* opinion and record, as well as the opinion and record from his first appeal, *People v. Hughes* (May 18, 2017, A145853) [nonpub. opn.] (*Hughes I*).

On remand, the trial court denied Hughes's motion for mental health diversion, finding that he would pose an unreasonable risk of danger to public safety if he were treated in the community. Hughes now appeals from that order, arguing that the trial court abused its discretion. We disagree and affirm.

## BACKGROUND

### A.

On June 26, 2011, Fairfield Police Department Officer Neal was dispatched to an apartment complex in Fairfield in response to a call from J.D. J.D. was Hughes's girlfriend and lived in apartment 17. The couple had been involved in a domestic dispute earlier that evening, and J.D. returned to her apartment to grab some belongings. She wanted officers to check the apartment before she went inside. J.D. had not seen Hughes with a gun that day but had seen him armed with a gun in the past.

Officer White arrived on the scene while Officer Neal obtained J.D.'s keys. When the officers entered the apartment, they smelled marijuana. Officer Neal repeatedly yelled, "Fairfield Police Department. Anyone inside Apartment 17 make yourself known." He also called Hughes by his name, but neither officer heard anything in response nor detected movement. After they "cleared" the rest of the apartment, they discovered the bathroom door was locked. Officer Neal advised Officer White they needed backup and went outside to get more information.

Officer Neal asked J.D. about the odor, and she told him that Hughes smoked marijuana. J.D. also said that the bathroom door had been unlocked when she left and if it was locked, then Hughes had probably killed himself. She explained that, when they fought, Hughes always said he was going to kill himself.

Officer Grimm and Sergeant Oviatt arrived and joined officers Neal and White. Officer Neal told the other officers about

2

the possible firearm and suicide and said they "obviously had to . . . force entry into the bathroom." He devised a plan in which he would holster his weapon, kick the bathroom door open, and then run down the hallway toward Sergeant Oviatt as Officer Grimm and Officer White entered the bathroom behind him. Sergeant Oviatt would provide cover for all three officers.

Before entering the bathroom, Officer Neal repeatedly shouted, "Jordan, it's the Fairfield Police Department. You need to come out if you're inside." When there was no response, Officer Neal kicked the bathroom door open, as planned, and Hughes immediately fired five shots. Officer Neal fell and then pushed Officer White and Officer Grimm toward the bedroom at their end of the hall while Sergeant Oviatt fired shots into the bathroom, hitting Hughes. The bathroom door closed. None of the officers were injured. Hughes eventually opened the door and crawled out of the bathroom, where he was arrested and transported to the hospital. A revolver was found on the bathroom floor.

Hughes testified that he had been inside the bathroom with a gun because he was high and was considering killing himself. He had the gun because he had been robbed at gunpoint by a friend the previous December and remained traumatized and always fearful for his life. Hughes heard people inside the apartment but did not hear them say they were police. He fired his gun blindly when the door was kicked in to scare whoever was in the apartment, but he did not want to kill anyone (other than himself). Hughes realized the people were police officers only after he had been shot.

The defense also called Roger Clark, a retired Los Angeles County Sheriff's Deputy and police procedures expert, who criticized the officers' decision to kick down the door. Clark explained that when a suicidal or mentally ill subject is barricaded in a room where he cannot escape, officers should set

3

up a line of communication and attempt to get the subject to come out on their own. Entering the room by force was too risky.

**B.**

Hughes was charged with three counts of attempted murder against Officers Neal, White, and Grimm (§§ 664, 187, subd. (a); counts one-three). It was further alleged that these crimes were premeditated and committed against peace officers engaged in the performance of their duties (§ 664, subds. (e), (f)). Hughes was also charged with four counts of assault with a firearm on a peace officer (§ 245, subd. (d)(1); counts four-seven), which named Officers Neal, White, and Grimm, and Sergeant Oviatt as victims. As to all seven counts, it was further alleged Hughes had personally and intentionally discharged a firearm (§ 12022.53, subd. (c)).

The jury acquitted Hughes of the attempted murder counts naming Officers White and Grimm as victims (counts two and three) but convicted him of attempted murder of Officer Neal (count one) and found true the allegation that count one was committed against a peace officer in the performance of his duties. The jury found untrue the allegation that the attempted murder of Officer Neal was premeditated. It also convicted Hughes of three counts of assault with a firearm on a peace officer as to Officers Neal, White, and Grimm (counts four-six), but acquitted him of the assault count against Sergeant Oviatt (count seven). Firearm enhancement allegations—for personal and intentional discharge (§ 12022.53, subd. (c))—were found true as to each count of conviction.

Hughes was originally sentenced to an aggregate term of 28 years to life (with the possibility of parole).

**C.**

Hughes appealed. In *Hughes I, supra*, A145853, this Division conditionally reversed the judgment and remanded the

4

matter for an in camera *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 review of the involved officers' personnel records. In the event a new trial was not ordered after the *Pitchess* review, *Hughes I* ordered reinstatement of the judgment of conviction and resentencing because the trial court's stay of firearm enhancement terms for counts five and six was unauthorized, given that these counts "(unlike count 4) involved different victims" than count one.

After issuance of the *Hughes I* remittitur, the trial court conducted an in camera review of the officers' personnel files and concluded no materials were discoverable. At resentencing, the trial court declined Hughes's request to strike the firearm enhancements (§ 12022.53, subd. (h)) and again imposed the same aggregate sentence. The court again stayed the sentence on count four pursuant to section 654 but imposed (without stay) concurrent 20-year terms for the firearm enhancements on each of counts four, five, and six.

Hughes again appealed. In *Hughes II, supra*, 39 Cal.App.5th at pages 889 and 892, Hughes requested remand of the matter to allow the trial court to exercise its newfound discretion to grant mental health diversion (§ 1001.36). Hughes also argued that, in any event, sentencing errors and clerical mistakes in the abstract of judgment required modification. (*Hughes II, supra*, at p. 889.)

This Division agreed on both points. (*Hughes II, supra*, 39 Cal.App.5th at pp. 889, 894-896.) Accordingly, the *Hughes II* disposition read: "The judgment is conditionally reversed, and the case is remanded to the trial court with directions to conduct a diversion eligibility hearing, under section 1001.36. If the trial court determines that Hughes qualifies for diversion under section 1001.36, then the court may grant diversion. If Hughes successfully completes diversion, then the trial court shall dismiss the charges. [¶] If the trial court determines that Hughes

5

is ineligible for diversion, or it grants diversion but Hughes does not successfully complete it, then his convictions and sentence are reinstated. The trial court is further directed to stay the term imposed on the firearm enhancement to count four; award Hughes 2,466 actual time credits through the date of his resentencing; and prepare an amended abstract of judgment consistent with this opinion. A copy of the amended abstract of judgment shall be forwarded to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed." (*Hughes II,* at pp. 896-897.)

## D.

After issuance of the *Hughes II* remittitur, Hughes filed a motion for mental health diversion (§ 1001.36). In support of his motion, Hughes apparently submitted psychological evaluation reports prepared by his retained neuropsychology expert, Howard Friedman, Ph.D. Although the precise reports submitted in support of the diversion motion are not in the record before us, the *Hughes II* record contains two of Dr. Friedman's reports.

The People filed written opposition to Hughes's motion for mental health diversion, arguing, among other points, that he would pose an unreasonable risk of danger to public safety if he were treated in the community.

At a hearing on the motion, Dr. Friedman was the only witness. Dr. Friedman testified that he interviewed Hughes, and performed psychological and neuropsychological testing, in 2012, 2018, and 2021. After the first evaluation, Dr. Friedman diagnosed Hughes with post-traumatic stress disorder (PTSD)— triggered by his victimization in an armed robbery in 2010 or 2011—and major depressive disorder.

In 2018, Hughes reported having taken an antidepressant (Zoloft) between 2012 and 2017. Because he no longer demonstrated significant depression or paranoia, Dr. Friedman

6

believed Hughes's depression and PTSD were resolved. Dr. Friedman was impressed with how much Hughes had improved between 2012 and 2018. Although Hughes's intellectual functioning was low average (23rd percentile) in both 2012 and 2018, his ability to reason and problem solve had improved significantly (from the bottom one percentile to "a low-average level"). Dr. Friedman opined that this improvement was due to treatment of Hughes's depression and PTSD, as both conditions affect the ability to exercise judgment, to think clearly, and to accurately assess information.

By the time of the 2021 evaluation, however, Hughes's depression and PTSD had returned; he was no longer in remission. Dr. Friedman believed the change was due to Hughes's discontinuation of treatment. At that point, Dr. Friedman also added alcohol use disorder and cannabis use disorder to Hughes's previous diagnoses. The two substance abuse disorders were in remission in the prison setting.

Dr. Friedman opined that Hughes would not pose an unreasonable risk of danger to public safety if treated in the community. Dr. Friedman explained his belief that it was highly unlikely Hughes would commit another violent crime because he showed no evidence of holding aggressive, antisocial, or hostile attitudes. Dr. Friedman believed the charged offenses resulted from "unusual circumstances"—i.e., Hughes was suicidal and suffering from serious mental health conditions that "contributed to incredibly poor judgment and reasoning ability at the time." However, Dr. Friedman also testified that Hughes's depression and PTSD could potentially get worse. Relapse into substance abuse could also aggravate Hughes's depression and PTSD.

The trial court denied Hughes's request for diversion.

## DISCUSSION

### A.

Hughes maintains the trial court abused its discretion by denying his request for mental health diversion. We disagree.

### 1.

In 2018, while the *Hughes II* appeal was pending, the Legislature enacted sections 1001.35 and 1001.36, thereby creating "a pretrial diversion program" for certain defendants with mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 624 (*Frahs*).) Section 1001.36 gives the trial court discretion, if the defendant meets six eligibility requirements, to grant either temporary or permanent postponement of prosecution to allow the defendant to undergo mental health treatment.[3] (Former § 1001.36, subds. (a)-(c), as amended by Stats. 2022, ch. 47, § 38; *Frahs,* at pp. 626-627.) The statute applies retroactively to defendants whose judgments are not final. (*Frahs,* at p. 624.)

The purposes of the legislation are to keep people with mental disorders from entering and reentering the criminal justice system "*while protecting public safety*," to allow local discretion in developing and implementing diversion across a continuum of care settings, and to meet the needs of those with mental health disorders. (§ 1001.35, italics added.) "Diversion

---

[3] After the trial court held its diversion eligibility hearing in this case, the Legislature further amended section 1001.36 by making the former "public safety" eligibility requirement a suitability criterion. (§ 1001.36, subds. (b), (c), as amended by Stats. 2022, ch. 735, § 1.) However, because a trial court must still deny diversion if the defendant does not meet the public safety criterion (§ 1001.36, subds. (a), (c)(4)), the subsequent amendments do not substantively impact the question before us on appeal. For clarity, we hereafter refer to the statutory subdivisions as they existed at the time of Hughes's hearing.

can be 'viewed as a specialized form of probation, . . . [that] is intended to offer a second chance to offenders who are minimally involved in crime and maximally motivated to reform.' " (*People v. Qualkinbush* (2022) 79 Cal.App.5th 879, 886.)

"As originally enacted, section 1001.36 provided that a trial court may grant pretrial diversion if it finds all of the following: (1) the defendant suffers from a qualifying mental disorder; (2) the disorder played a significant role in the commission of the charged offense; (3) the defendant's symptoms will respond to mental health treatment; (4) the defendant consents to diversion and waives his or her speedy trial right; (5) the defendant agrees to comply with treatment; and (6) the defendant *will not pose an unreasonable risk of danger to public safety* if treated in the community. (Former § 1001.36, subd. (b)(1)–(6) [as added by Stats. 2018, ch. 34, § 24].)" (*Frahs, supra*, 9 Cal.5th at pp. 626–627, italics added.) Section 1001.36 was later amended to make defendants charged with certain crimes, including murder, voluntary manslaughter, and rape, categorically ineligible for diversion. (Former § 1001.36, subd. (b)(2), as amended by Stats. 2018, ch. 1005, § 1; *Frahs, supra,* at p. 627.) Defendants charged with attempted murder or assault with a firearm on a peace officer are not categorically excluded. (Former § 1001.36, subd. (b)(2), as amended by Stats. 2018, ch. 1005, § 1.)

If a defendant meets the eligibility requirements, the trial court must also determine whether "the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant." (Former § 1001.36, subd. (c)(1)(A), as amended by Stats. 2022, ch. 47, § 38.) The court may then grant diversion and refer the defendant to an approved treatment program for no longer than two years. (Former § 1001.36, subds. (c)(1)(B), (c)(3), as amended by Stats. 2022, ch. 47, § 38.) If the defendant "satisfactorily" completes the diversion program, the court shall dismiss the

criminal charges. (Former § 1001.36, subd. (e), as amended by Stats. 2022, ch. 47, § 38.)

We review the trial court's ruling on mental health diversion for abuse of discretion. (See *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 (*Whitmill*); *People v. Bunas* (2022) 79 Cal.App.5th 840, 848.) " 'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence.' " (*Whitmill, supra,* at p. 1147.)

**2.**

Hughes asserts that the trial court applied the wrong standard in assessing the risk to public safety. The record does not support his position.

Section 1001.36 defines "unreasonable risk of danger to public safety" by reference to section 1170.18. (Former § 1001.36, subd. (b)(1)(F), as amended by Stats. 2022, ch. 47, § 38; *People v. Moine* (2021) 62 Cal.App.5th 440, 449-450.) Section 1170.18, in turn, defines " 'unreasonable risk of danger to public safety' " as "an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" section 667, subdivision (e)(2)(C)(iv). (§ 1170.18, subd. (c); *Whitmill, supra*, 86 Cal.App.5th at p. 1149.) Qualifying violent felonies are known as " 'super strikes' " and include murder, attempted murder, solicitation to commit murder, assault with a machine gun on a police officer, possession of a weapon of mass destruction, any serious or violent felony punishable by death or life imprisonment, and any sexually violent offenses or sexual offense committed against minors under the age of 14. (§ 667, subd. (e)(2)(C)(iv); *People v. Jefferson* (2016) 1 Cal.App.5th 235, 242.)

Hughes does not meet his burden of demonstrating that the trial court used the wrong standard. (See *People v. Pacheco*

10

(2022) 75 Cal.App.5th 207, 213 [appellant bears burden to demonstrate abuse of discretion]; *People v. Jacobo* (1991) 230 Cal.App.3d 1416, 1430 [reviewing courts presume that trial court knew and applied correct law, unless the appellant affirmatively demonstrates otherwise].) He does not cite any portion of the record that shows the court analyzed the risk to public safety under any standard other than what we have described above.

In fact, the People explicitly argued that Hughes's charged offenses and prior robbery offenses (committed as a juvenile) demonstrate that he poses an unreasonable risk to public safety *because, if treated in the community, he was at unreasonable risk to commit a super strike.* In finding that Hughes's treatment in the community presents an unreasonable risk, the trial court explicitly referenced the underlying charges—three of which themselves qualify as "super strikes"—and the risk that he would commit similar offenses in the future. (§ 667, subd. (e)(2)(C)(iv); see *People v. Qualkinbush, supra,* 79 Cal.App.5th at p. 892, fn. 11 [court "must treat the matter as if the charges . . . have not yet been adjudicated"].)

The trial court explained: "[W]hat concerns me is not just the regression . . . [but also] how [Hughes], when he is in crisis faced with various stressors, whether it's substance abuse related or purely some other type of psychological stressors or conditions he's suffering from, it's . . . how he actually presents to the community. . . . [¶] [Hughes] didn't just . . .try to kill himself that day. . . . He had the loaded firearm, which he ultimately did discharge, not to himself, but in the direction of the officers. . . . [¶] . . . I do believe not just the crime itself but combined with the history[,] his recent regression . . . [, and] his juvenile history, which was close in time to [the charged] event. . . . [¶] . . . He still presents a danger. Not that he's out there trying to harm strangers, but when he engages in episodes such as he's had before with his mental condition continuing albeit with some

11

improvement, the unreasonable risk to public safety remains." The court concluded, "I don't believe the risk is low enough to grant the motion."

There is no affirmative indication that the trial court applied an incorrect legal standard.

**3.**

Nor do we agree with Hughes that substantial evidence does not support the trial court's implicit finding that his treatment in the community presents an unreasonable risk that he will commit a new super strike.

In assessing the risk, the trial court may consider the opinions of the district attorney, the defense, and qualified mental health experts, *as well as the defendant's violence and criminal history, the circumstances of the charged offense, and any other factors the court deems appropriate.* (Former § 1001.36, subd. (b)(1)(F), as amended by Stats. 2022, ch. 47, § 38; *People v. Bunas, supra*, 79 Cal.App.5th at pp. 862, 866-867; *People v. Moine, supra,* 62 Cal.App.5th at p. 450.)

Here, in implicitly finding that it was not satisfied community mental health treatment would sufficiently mitigate the risk Hughes would commit a super strike, the trial court explicitly considered the evidence of the charged offenses (three of which were undisputedly super strikes, and all seven of which were undisputedly violent felonies involving the discharge of a firearm), Hughes's juvenile history (which undisputedly involved the commission of two violent felonies), and Hughes's treatment history (to which Dr. Friedman testified). On this record, Hughes has not shown that the trial court's finding is unsupported by substantial evidence.

Nor did the trial court err by ignoring Dr. Friedman's uncontradicted public safety opinion, as Hughes suggests. The trial court (in its role as fact finder) has no obligation to accept

even unanimous expert opinion. (*In re Scott* (2003) 29 Cal.4th 783, 823.) The value of an expert's testimony depends on the material and reasoning on which the opinion is based. (*Ibid.*)

Here, the trial court could reasonably conclude that the value of Dr. Friedman's public safety opinion was limited. With respect to the charged offenses, Hughes himself told Dr. Friedman that, although he was "uncertain," he thought he fired his gun at the bathroom door because he wanted the police to kill him. Dr. Friedman's explanation of why such a situation was unlikely to reoccur was not particularly persuasive. Although Dr. Friedman testified that Hughes was amenable to treatment, he failed to appropriately explain how that conclusion squared with the fact that, even in the highly structured prison environment, Hughes discontinued his medication and allowed his symptoms to return. The defense expert also recognized that Hughes's depression and PTSD could worsen and would very likely be aggravated—and could again lead to crisis—if he were to relapse. Furthermore, Hughes had not maintained any period of sobriety between the age of 14 and his arrest.

On this record, it was not unreasonable for the trial court to reject Dr. Friedman's ultimate opinion and to infer that community treatment would present an unreasonable risk that Hughes would again be in crisis and again fire a gun at others— thereby potentially committing a new super strike offense (murder). (Cf. *People v. Pacheco, supra,* 75 Cal.App.5th at pp. 209-210, 213-214; *People v. Jefferson, supra*, 1 Cal.App.5th at p. 245 .) No abuse of discretion is shown.

## DISPOSITION

The order denying mental health diversion is affirmed. If it has not already done so, the trial court is directed to reinstate Hughes's convictions and sentence (as modified), in accordance with our disposition in *Hughes II, supra,* 39 Cal.App.5th at pages 896-897.

13

_____
BURNS, J.

We concur:

_____
JACKSON, P.J.

_____
CHOU, J.

A166332