Filed 3/17/26  P. v. Klincke CA2/4

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B344270 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA508315 |
| DILLON ANTHONY KLINCKE, | |
| Defendant and Appellant. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Shelly B. Torrealba, Judge. Affirmed.

Werksman Jackson & Quinn, Alan Jackson and Kelly C. Quinn for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Dillon Anthony Klincke was charged with various crimes and allegations arising from an incident in which he entered the home of an elderly couple he knew, assaulted a 71-year-old woman, forced her to open a safe which he knew contained expensive watches, tied her up with zip ties, threatened to kill her and her grandchildren, and fled with the watches. After the trial court found Klincke unsuitable for mental health diversion, he pleaded no contest to residential robbery and allegations that he personally used a firearm and inflicted great bodily injury. The court sentenced him to 10 years in state prison. On appeal, Klincke raises various arguments that the trial court's denial of mental health diversion was error. We affirm.

## PROCEDURAL BACKGROUND

In 2023, the Los Angeles County District Attorney filed an information charging Klincke with first degree residential robbery (Pen. Code,[1] § 211; count one), first degree residential burglary with a person present (§ 459; count two), elder abuse (§ 368, subd. (b)(1); count three), false imprisonment of an elder (§ 368, subd. (f); count four), assault with a semiautomatic firearm (§ 245, subd. (b); count five), assault by means of force likely to produce great bodily injury (§ 245, subd (a)(4); count six), and making criminal threats (§ 422, subd. (a); count seven). The information also included several allegations that the victim of those crimes was over 65 years old (§ 667.9, subd. (a)), and that in the commission of several offenses, Klincke personally used a

---

[1] Subsequent unspecified references to statutes are to the Penal Code.

firearm (§ 12022.5, subd. (a)) and personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)).

Following a preliminary hearing, Klincke filed a motion for mental health diversion under section 1001.36. The motion included a report by Jeffrey Whiting, a clinical psychologist, who concluded Klincke suffered from Bipolar I Disorder, that his crimes were the "result of being in throes of a manic episode, with severe psychosis," and that his "risk to the community would be nil" if he were to comply with all aspects of his mental health treatment.

The prosecution filed an opposition, then Klincke filed a "supplemental petition" for mental health diversion, which included reports from two additional mental health consultants who both concluded that Klincke met the criteria for Bipolar II Disorder, Opioid Use Disorder, and Stimulant Use Disorder. Those individuals further concluded that Klincke's mental health disorders were contributing factors to the commission of the charged offenses, and that Klincke would not pose an unreasonable risk of danger to public safety if treated in the community.

After holding a hearing, the trial court denied Klincke's motion, concluding that he was unsuitable for diversion. Klincke then filed a petition for writ of mandate in this court.[2] A different panel of this court denied Klincke's petition, concluding he failed to demonstrate a prima facie case that the trial court abused its discretion. The Supreme Court denied Klincke's petition for review.

---

[2] We take judicial notice of the docket in that case (no. B341008). (Evid. Code, § 452, subd. (d).)

3

In February 2025, Klincke pleaded no contest to residential robbery and allegations that he personally used a firearm and inflicted great bodily injury. The trial court dismissed the remaining counts and allegations and sentenced him to 10 years in state prison.

Klincke timely appealed.

## FACTUAL BACKGROUND[3]

Henry Jannol, a watch collector, owned approximately 900 watches; around 340 of them were stored in a safe in his home. Those 340 watches were worth between $3 million and $5 million. Henry Jannol is married to Miryam Jannol.[4] The Jannols had known Klincke for years when the events that gave rise to this case occurred. Klincke had an affinity for watches and had been to the Jannols' home on multiple occasions to buy watches. Klincke was familiar with the location of safes in the home that held the watches.

On the afternoon of August 17, 2022, Miryam, who was 71 years old, was sitting at her computer in a converted garage behind her home when she saw a man (Klincke) wearing a mask and dark clothing run down her driveway heading towards her. As soon as Klincke entered the room, he punched her in the nose, and she started bleeding. He repeatedly ordered her to "open the safe," grabbed her by the hair, and dragged her off her chair to

---

[3]   The following information is taken from the victims' and investigating officer's testimony adduced at Klincke's preliminary hearing and at the evidentiary hearing on his diversion motion.

[4]   To avoid confusion, we will refer to Mr. and Ms. Jannol by their first names.

the area where the safe was located.  He hit her over the head with a black, square, heavy object that she believed was a gun.

Miryam was terrified, and her hands were shaking as she attempted to open the safe.  She was unable to open the safe on the first try.  Klincke continued to hit and kick her.  She was finally able to open the safe, and Klincke took the watches.

Klincke then pushed Miryam to another safe, which was hidden, and ordered her to open it.  He continued to kick her while ordering her to open the second safe.  When she could not remember the code to the second safe, Klincke became angry and continued to hit her as he repeatedly ordered her to open the safe.  She tried telling him that she did not know the code, and he continued to hit her.

When Miryam was unable to open the second safe, Klincke used zip ties to tie her arms together.  The ties were so tight that she screamed in pain.  Klincke put the watches into one of Miryam's suitcases.  Miryam cried, "please don't kill me.  I have grandchildren."  Klincke threatened to kill her and her grandchildren.  He threatened to kill her three or four times.  Klincke then took the watches and left.  Miryam was left severely bruised and bloodied from the beating.

When police interviewed Klincke after arresting him, he was calm about the situation and appeared to be trying to elicit information from a detective to see what he knew.  Klincke was clear and focused.  Nothing about his demeanor appeared to be abnormal.  Klincke did not have common signs of drug use such as burnt fingertips from holding pipes or track marks on his arms.

Police searched Klincke's car and found a taser and a pistol that did not appear to match the description given by Miryam.

The trunk of the car was lined with a trash bag laid flat to cover the entire area. Officers searched Klincke's residence and found a black Glock handgun soaking in a bucket of bleach. The gun's magazine and bullets were removed from the gun and also soaking in the bleach. Officers also found passports, luggage that appeared to be ready for use, and what appeared to be an illegal rifle.

During the search of Klincke's residence, officers also found a set of keys from a wine storage facility where Klincke's mother had an account. Klincke had access to his mother's storage lockers at that facility, and when officers searched her storage space, they discovered a bin that contained hundreds of watches, which Henry confirmed were his watches. The bin that contained the watches smelled of bleach, and it contained a key to the Jannols' home. It also contained a mask and a pair of boots, which were tested for DNA. The tests indicated the mask had an apparent mixture of DNA from Klincke and Miryam, and the boots had an apparent DNA match to Miryam.

## DISCUSSION
### A. Applicable Law and Standard of Review

Section 1001.36 gives trial courts the discretion to grant pretrial diversion for individuals suffering from certain mental health disorders. (*People v. Frahs* (2020) 9 Cal.5th 618, 626 (*Frahs*).) The purpose of the statute is to promote the following goals: (1) increase "diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety"; (2) allow local discretion and flexibility for counties to develop and implement diversion for individuals with mental disorders across a

6

continuum of care settings; and (3) provide "diversion that meets the unique mental health treatment and support needs of individuals with mental disorders." (§ 1001.35, subds. (a)–(c).)

Section 1001.36, subdivision (b) provides that a defendant is eligible for pretrial diversion if two criteria are met. First, the defendant has been diagnosed with a mental disorder, such as the one with which defendant was diagnosed, within the last five years by a qualified mental health expert. (§ 1001.36, subd. (b)(1).) Second, the "defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(2).) "If the defendant has been diagnosed with a mental disorder, the court shall find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (*Ibid.*)

If a defendant meets these eligibility requirements, the defendant is suitable for pretrial diversion if all of the following criteria are met: "(1) In the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder causing, contributing to, or motivating the criminal behavior would respond to mental health treatment. [¶] (2) The defendant consents to diversion and waives the defendant's right to a speedy trial . . . . [¶] (3) The defendant agrees to comply with treatment as a condition of diversion . . . . [¶] [and] (4) The defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community . . . ." (§ 1001.36, subd. (c)(1)–(4).) At issue here is whether the fourth criterion is satisfied.

7

We review a trial court's ruling on a petition for pretrial mental health diversion for abuse of discretion. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147.) "A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation]." (*People v. Moine* (2021) 62 Cal.App.5th 440, 449 (*Moine*).)

## B. Trial Court's Ruling

The trial court concluded that although Klincke may have been eligible for diversion, he was unsuitable for diversion given the dangerous circumstances surrounding his offenses, which included entering the home of a vulnerable 71-year-old woman with a gun and violently assaulting her. In finding Klincke unsuitable for diversion, the trial court explained, in pertinent part:

> This is a terrible situation that has arisen out of choices made by Mr. Klincke, both consciously and maybe driven by his underlying . . . mental health issue. [¶] [But] [i]t appears from everything that's been presented that even taking into account that Mr. Klincke has these diagnosed mental health disorders, that this is not the kind of crime [where] [the] legislature intended [the defendant should be granted diversion].

In the *Bunas*[5] case . . ., that was another situation where mental health was denied because the underlying charges are not suitable for mental health diversion.  And in that case, there was domestic violence with a knife, great bodily injury was inflicted, and [the defendant made] criminal threats.  [¶]  That . . . case is very similar to this case wherein criminal threats . . . are part of the underlying charges, where there was significant great bodily injury, where there was use of a firearm, going into the residence, the age and vulnerability of the victim being elderly – I believe 71 at the time.  And . . . all of those things make it very clear that . . . although the defendant . . . may meet the eligibility requirements, . . . the offenses are not the kind of crime[s] that would [render him] suitable for diversion . . . . [¶] [So] I think it's pretty clear that the kind of crime that was committed in this case is not the kind of crime that—although it's not specifically delineated in subsection (d), it is a violent and serious offense and not suitable for diversion.  So the motion is denied.

### C. Analysis

Klincke raises several contentions that the trial court erred in denying him mental health diversion.  We will address his arguments in turn.

---

5       *People v. Bunas* (2022) 79 Cal.App.5th 840 (*Bunas*).

9

## 1. We presume the trial court applied the proper standard in finding Klincke unsuitable for diversion

Klincke first suggests that the trial court erred by not explicitly stating that its basis for deeming him unsuitable for diversion was a finding that there was an unreasonable risk he will commit a super strike if treated in the community. Klincke is correct the proper inquiry for determining his suitability under subdivision (c)(4) of the diversion statute is whether there is an unreasonable risk he will commit a super strike if treated in the community. (§ 1001.36, subd. (c)(4) [a defendant is suitable for diversion only if "[t]he defendant will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community."]; § 1170.18, subd. (c) ["As used throughout this code, 'unreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of" section 667, subdivision (e)(2)(C)(iv), a list of offenses commonly referred to as super strikes].) Super strikes include sexually violent offenses, child molestation, homicide, attempted homicide, solicitation to commit murder, assault with a machine gun on a peace officer or fire fighter, possession of a weapon of mass destruction, or a violent felony punishable by life imprisonment or death. (See § 667, subd. (e)(2)(C)(iv).)

Klincke is also correct that the trial court did not explicitly state it was denying relief based on a finding that there was an unreasonable risk he would commit a super strike. "In the absence of evidence to the contrary, [however,] we presume that the trial court" knew and applied the correct legal standard. (*People v. Thomas* (2011) 52 Cal.4th 336, 361.) In other words,

10

even if the record were essentially silent on what standard the trial court applied in finding Klincke unsuitable, we would presume that the court correctly made the finding based on a conclusion that there was an unreasonable risk he will commit a super strike if treated in the community.

In any event, the record is not silent—the prosecution, in briefing the issue for the trial court, directly quoted section 1170.18, alerting the trial court that the proper suitability inquiry under section 1001.36 was whether there was "an unreasonable risk" that the defendant will commit a super strike. Nothing in the record indicates the trial court deviated from this standard, and we presume the court read and properly applied the clear language of the statute. Stated differently, on this record, we conclude the trial court denied Klincke diversion based on an implied finding that there was an unreasonable risk he would commit a super strike if treated in the community.[6]

---

[6] Klincke takes the position that the trial court, in describing his conduct as "violent and serious," misapplied the law by erroneously assuming that the commission of any "serious felony" enumerated in section 1192.7, subdivision (c) or "violent felony" enumerated in section 667.5, subdivision (c) would render him unsuitable for diversion. But that is not what the trial court said or did. Indeed, the court did not refer to section 1192.7 or section 667.5 in making its ruling. It is true that, in finding Klincke unsuitable for diversion, the court described the *circumstances* of his offenses as being "violent and serious." But the court was using those words colloquially. Those words, used colloquially, accurately described Klicnke's conduct, which involved entering an elderly woman's home with a gun and violently assaulting her.

11

## 2. The trial court's finding that Klincke was unsuitable for diversion is supported by substantial evidence

Klincke next argues the record contains insufficient evidence to support the trial court's implied finding that he posed an unreasonable risk of committing a super strike if treated in the community. We are unpersuaded.

As mentioned above, even when a trial court applies the correct legal standard, it still may abuse its discretion by basing its decision "on express or implied factual findings that are not supported by substantial evidence [citation]." (*Moine, supra,* 62 Cal.App.5th at p. 449.) Here, however, substantial evidence supports the trial court's implied finding that Klincke posed an unreasonable risk of committing a super strike if treated in the community.

Klinke acted in a calculated, despicable, and brutal manner. At the time he attacked Miryam, Klinke was a 31-year-old man. Klinke committed violent offenses using much more force than necessary to accomplish his criminal ends, displaying a callous indifference to the suffering and physical safety of a much older, vulnerable, elderly victim. He credibly threatened to kill her and terrified her. He caused his victim to incur significant injuries by repeatedly striking her with his fists and a gun, including repeatedly hitting her head and face. He did these things according to a careful plan and then attempted to cover his tracks. He showed no remorse or reflection when he was arrested, and he lucidly and calmly answered the police's questions.

Had Klincke's elderly victim passed away as a result of his dangerous assault, Klincke could have been found guilty of felony

12

murder under section 189, subdivision (e)(1).[7]  That Klincke fortuitously did not commit a super strike is not dispositive.  A defendant may be unsuitable for diversion even if he or she has not committed a super strike offense.  (See *People v. Nelson* (March 5, 2026, B342722) __ Cal.App.5th __ [2026 WL 619823]; *People v. Pacheco* (2022) 75 Cal.App.5th 207, 209; *Buenos*, *supra* 79 Cal.App.5th at pp. 844, 846.)

Klinke relies heavily on the testimony of three mental health experts who opined he would not pose a risk to public safety if treated in the community.  But the trial court was free under the circumstances of this case to reject that testimony.  "Although experts may testify about their opinions, the fact finder decides what weight to give those opinions."  (*In re Scott* (2003) 29 Cal.4th 783, 823.)  "This is especially important when the witnesses are not neutral court-appointed experts but experts hired by a party specifically seeking evidence supporting that party's position."  (*Ibid.*)

In his reply brief, Klincke cites a recent case, *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671 (*Gomez*), in support of his position.  *Gomez* concluded the trial court's finding that the defendant posed an unreasonable risk of danger if treated in the community was unsupported by substantial evidence.  (*Id.* at pp. 689–690.)  Klincke's reliance on *Gomez* is misplaced.  "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts."  (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)

---

[7]    That section, read in tandem with section 189, subdivision (a), provides that a participant in a robbery is liable for murder if that person was the actual killer.

13

Moreover, the circumstances in Gomez's case were significantly different from Klincke's case.  Gomez was charged with a robbery, but a man she committed the crime with was the one who assaulted the victim.  (*Gomez, supra*, 113 Cal.App.5th at p. 680.)  Gomez "[n]ever touched the victim." (*Id.* at p. 690.)  The robbery in *Gomez* occurred as the victim "was walking on the side of the road." (*Id.* at p. 680.)  Here, by contrast, Klincke brought a gun into a vulnerable 71-year-old woman's home and personally violently assaulted her.  *Gomez* thus does not persuade this court that the trial court's unsuitability finding is unsupported by substantial evidence.

### 3.  The trial court's reliance on *Bunas* was proper

The trial court cited *Bunas* in explaining its reasoning.  While the facts of this case are not entirely analogous, *Bunas* lends support to the trial court's decision.

In *Bunas*, the defendant struck his girlfriend on the head with a flashlight and a knife, threatened to kill her, and dragged her by the hair.  (*Bunas, supra*, 79 Cal.App.5th at pp. 850–851.)  Although he inflicted " 'relatively minor wounds' " (*id.* at p. 853), his assault "could have resulted in a traumatic condition to the victim." (*Id.* at p. 848.)  After an expert opined that the defendant's substance abuse and mental health disorders may have contributed to his behavior (*id.* at p. 853), the trial court determined that the defendant was not suitable for diversion, and the appellate court affirmed.  The present case is similar to *Bunas* in many ways, including the defendant's use of non-lethal but dangerous violence and threats to kill the victim.

We acknowledge that there are a few significant differences between *Bunas* and this case.  For example, in *Bunas*, the

14

defendant had previously committed a serious felony and a strike prior. (*Bunas, supra*, 79 Cal.App.5th at p. 848.) Klincke did not have similar prior convictions. But Klincke's violent conduct was in some ways more troubling than the conduct of the defendant in *Bunas*. While the defendant in *Bunas* acted in a rage in response to a specific event (*id.* at p. 850), Klincke committed violence pursuant to a well-planned armed robbery, and then tried to cover evidence of his crime. Moreover, Klincke's attack was arguably more dangerous because his victim was an elderly, vulnerable women, and he was using a gun.

We reject Klincke's assertion that the trial court misunderstood or misapplied *Bunas* in finding him unsuitable for diversion. As this court noted in denying Klincke's writ in case number B341008, *Bunas* recognized "there is nothing in section 1001.36, with respect to either eligibility or suitability, that precludes a trial court from relying primarily, or even entirely, on the circumstances of the charged offense or offenses in denying a motion for diversion." (*Bunas, supra*, 79 Cal.App.5th at pp. 861–862.) Klincke does not take issue with this aspect of *Bunas*. Instead, he contends that whereas *Bunas* relied on "the circumstances of the offense," here, the trial court erred by merely relying on "the charges," i.e., the offenses with which Klincke was charged. In other words, Klincke argues that the trial court did not find him unsuitable based on the circumstances of his crimes, but rather by looking facially at the charged offenses themselves while disregarding the actual facts of those offenses. We do not read the trial court's reasoning so narrowly. In finding Klincke unsuitable for diversion, the court explicitly emphasized the serious nature of the circumstances of his offenses, which included the use of a firearm, entering a

15

vulnerable elderly woman's residence, and violently assaulting her.  We therefore reject Klincke's contention that the trial court's application of *Bunas* was erroneous, as that argument is belied by the record.

### 4. Klincke's argument that the trial court improperly exercised residual discretion is unavailing

Section 1001.36 provides the trial court with discretion to deny mental health diversion even if it finds a defendant meets the statutory eligibility and suitability criteria.  (*People v. Cabalar* (2025) 117 Cal.App.5th 41, 53.)  Such discretion is commonly referred to as a court's residual discretion.  (*Ibid.*)  "Where the court chooses to exercise this residual discretion to deny diversion, its statement of reasons should reflect consideration of the underlying purposes of the statute and explain why diversion would not meet those goals."  (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 893.)

Klincke argues the trial court may have attempted to exercise residual discretion in denying him diversion, and if it did, it did so improperly for various reasons.  We reject the premise that the trial court based its decision to deny Klincke diversion on its residual discretion.  As explained above, the court found Klincke unsuitable for diversion based on its implied finding that there was an unreasonable risk he would commit a super strike if treated in the community.

## DISPOSITION

The order denying Klincke's motion for mental health diversion is affirmed, as is the judgment.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


TAMZARIAN, J.

We concur:


ZUKIN, P. J.


MORI, J.